IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. CR-06-00236-01 |
| ) | |
| KYLE BARTOLAIN, ) | Sentencing Date: December 19, 2006 |
| ) | |
| ) | The Honorable Gladys Kessler |
| Defendant. ) | |

**POSITION OF DEFENDANT WITH RESPECT TO SENTENCING**

COMES NOW Defendant, Kyle Bartolain, by and through counsel, and hereby represents that she has reviewed the Probation Office's Presentence Report (hereinafter "PSI"), and provides the Court with the following position relating to his sentencing.

**I.  Applicable Recent Legal Background**

The Supreme Court recently decided United States v. Blakely, 124 S. Ct. 2531 (2004) and United States v. Booker/United States v. Fanfan, 125 S. Ct. 738 (2005), The Booker decision addressed the salient unanswered issue that was not explained in Blakely.  That is, whether the Blakely Sixth Amendment rationale applied to the United States Sentencing Guidelines ("guidelines").

The decision itself was broken down into two separate opinions.  The first opinion affirmatively established that the Blakely decision does apply to the guidelines.  The second opinion provided a remedial ruling for the purpose of guiding courts as to what ramifications the

1

Sixth Amendment issue ruling should have on Federal sentencings. That remedial opinion from Booker most prominently provided that the mandatory nature of the federal sentencing guidelines is "incompatible" with the Booker Court's Sixth Amendment holding. The Court established that 18 U.S.C. § 3553(b)(1) (which specifies that district courts *shall* impose a sentence in accordance with the guidelines) must be severed and excised from the remainder of the Sentencing Reform Act, and that the guidelines are thus, "effectively advisory" in all cases. Thus there are no mandatory guidelines in Federal Court, and District Courts are no longer bound by guidelines ranges.

Additionally, based on this recently developed sentencing scheme, the existing body of case law that interprets the determination of the guideline range, and any departures therefrom, is no longer directly on point. That body of case law, while elucidating in some respects, was nonetheless developed when the guidelines were mandatory. Thus, the Court now has the authority to implement its own discretion to consider departing from a guideline base offense level to reach an appropriate guideline range, which itself is no longer mandatory.

In any case, pursuant to the mandate of Booker, an appropriate, discretionary guidelines range is to be consulted and taken into account, but to be considered with the other factors contained within 18 U.S.C. § 3553, in determining an appropriate sentence for Mr. Bartolain. Under that code section, the first factor for the Court's consideration is § 3553(a)(1), which directs the court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." Additionally, there exists an overriding principle and basic mandate, contained in § 3553(a), which requires district courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in

subsection (a)(2). The four purposes include:

>  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>  (B) to afford adequate deterrence to criminal conduct;
>
>  (C) to protect the public from further crimes of the defendant; and
>
>  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

## II.  Mr. Bartolain Seeks A Sentence Below The Guidelines Range, As Authorized In Booker, Pursuant To The Factors In 18 U.S.C. §3553

### *A.  The History And Characteristics Of Mr. Bartolain*

Mr. Bartolain asks the court to consider the four factors in 18 U.S.C. §3553, and for a determination that such factors support his request for a sentence below the guidelines range in this case based on his overall history and characteristics.

**1.  Mr. Bartolain's Mental Health Issues** (Much of the information provided herein is established in the report submitted by Ronald M. Boggio, Ph.D., attached as Exhibit C)

*a) His initial diagnosis*

On August 18, 2006, when Mr. Bartolain entered his plea of guilty in this case, the court was provided with documents that illustrated Mr. Bartolain's mental health issues which were diagnosed back in 2002 (see Exhibit A). At that time, when Mr. Bartolain was 21 years old, he received a psychological evaluation at Walter Reed Army Medical Center as part of an assessment based on concerns about attention deficit disorder. Mr. Bartolain was not diagnosed with an attention disorder, but was diagnosed with Depressive Disorder, Not Otherwise

Specified (NOS). That diagnosis is frequently given to individuals early in their psychiatric history before clearer symptoms emerge or when the patient has not had ongoing mental health contact (see Exhibit C; report of Dr. Boggio; "Subsection XI. Psychiatric History"). Unfortunately, Mr. Bartolain did not follow up on the recommended referral for treatment indicated in the evaluation report. Mr. Bartolain was planning on going into the Army, and felt that depression would prevent his enlistment. Instead, he decided to try and deal with his issues himself - a decision which we now know was foolish.

### b. *The effect of his military service after the initial diagnosis*

During the ensuing time period, Mr. Bartolain's mental health issues did not resolve themselves, but instead were apparently exacerbated by a series of frustrating assignments and deployments which did not meet the expectations he had developed of doing something he was proud of, and which eventually served to further socially isolate him. In the time period shortly after basic training, among other things, Mr. Bartolain did not qualify for Ranger training, and was essentially assigned to do more monotonous jobs and busy ("scut") work. Nonetheless, while serving the Army in Afghanistan, Mr. Bartolain was finally assigned as a radiotelephone operator (RTO) to a company which was doing patrols. Although it was hard work, he appreciated the assignment, and was again motivated with the anticipation of doing more work as an RTO. However, upon returning to Afghanistan, he helped a fellow soldier fix a radio, and was not again assigned as an RTO because a superior officer felt that such an action indicated Mr. Bartolain's peers would become too dependent on him and not learn on their own.

Mr. Bartolain became despondent with this decision, and was shortly thereafter sent to two remote Afghani towns with one or two other servicemen, to ensure the proper functioning of

the radio equipment. For five months, he had very little to do and served in a capacity which completely isolated him socially. After an additional frustrating assignment, Mr. Bartolain was sent back to the United States on scheduled leave, during which time, the incident herein occurred.

*c. The break-up with Ms. Epperly*

While Mr. Bartolain was serving in Afghanistan, in November of 2005, his girlfriend, Ms. Rhonda Epperly, informed him via e-mail that she had cheated on him, and they broke up from overseas. The two had met when Mr. Bartolain was briefly stationed in Georgia, in May, 2004. They became close, and continued to see each other during Mr. Bartolain's first deployment to Fort Bragg. This development was devastating for Mr. Bartolain, who described himself as being very self-conscious and unable to approach girls as a pre-teen and teenager. (Exhibit C, p.8). He noted that after it happened, "I was just sitting there on mission and thinking about it all day." (Exhibit C, p. 9). Mr. Bartolain indicated that, at the time, he felt "very depressed," "thought about the break-up all day long" and had difficulty sleeping. (Exhibit C, p. 11). The break-up was right around the same time Mr. Bartolain began his five months of deployment in two remote Afghani towns, an assignment during which he was not busy, and during which he had plenty of time to think.

After returning to Fort Bragg in April of 2006, and continuing through July, when he was arrested for the instant offense, Mr. Bartolain was still dealing with the break-up and experiencing intense loneliness. He engaged in casual dating and casual sexual relationships, but couldn't fill the void from the break-up with Ms. Epperly. (Exhibit C, p.9).

*d. Evaluation of Dr. Stewart; September 19, 2006*

5

After the instant offense and subsequent to his plea, Mr. Bartolain was initially evaluated by Colonel Stewart, Chief of the Department of Behavioral Health and a psychologist at the DeWitt Army Hospital in Fort Belvoir. Colonel Stewart administered testing with the Minnesota Multiphasic Personality Inventory - II ("MMPI-II"), along with some other measures related to detecting attentional disorders and a clinical interview. (See Report; Exhibit B). Dr. Stewart concluded that Mr. Bartolain met clinical criteria for Major Depressive Disorder, Chronic, Severe; and Dysthymic Disorder. Medication and individual psychotherapy were both recommended.

*e. October 5, 2006, anxiety attack*

On October 5, 2006, Mr. Bartolain's mental health issues reached a critical point. During a sleepless night, he suffered a severe anxiety attack, and was extremely tense and anxious, was suffering from intense headache pains and shaking uncontrollably. Mr. Bartolain was taken by his parents to DeWitt Army Hospital to treat his condition. On October 6, 2006, based on his treatment, he was prescribed, and has since taken, Depakote and Paxil. Mr. Bartolain has also met with R. Mark Binderman, Ph.D., on a weekly basis since October 20, 2006. (see information below).

*f. Evaluation of Dr. Boggio*

Attached hereto as Exhibit C is a forensic psychological evaluation produced by Ronald M. Boggio, Ph.D. Dr. Boggio based his report, in significant part, on extensive direct interviews with Mr. Bartolain, Mr. Bartolain's parents and Rhonda Epperly. He also reviewed case documents, including discovery materials and the e-mail communications of Mr. Bartolain, and conducted reviews of all prior psychological testing and reports. Dr. Boggio augmented this

background information with psychological testing of his own (he administered the Hare Psychopathy Checklist - Second Edition Revised and the Static-99). The full report produced by Dr. Boggio is attached hereto as Exhibit C. However, to highlight certain aspects of the report, summary information is also provided as follows:

- Mr. Bartolain suffers from Bipolar II Disorder (Recurrent Major Depressive Episodes with Hypomanic Episodes) (Exhibit C; p. 15);

- Aside from the instant offense, all of Mr. Bartolain's sexual activity (including relationships) has been related to peer age women (Exhibit C; pp. 8-10, 17);

- Mr. Bartolain does not meet criteria for pedophilia or any other sexual deviancy, and he shows no evidence of antisocial personality or psychopathy - the factors which correlate highly with increased risk for future sexual offending (Exhibit C; p. 17);

- The best explanation for Mr. Bartolain's behavior in the instant offense is that it resulted from poor judgment significantly influenced by his psychiatric condition. He was still feeling despondent from his break-up with Ms. Epperly and felt that he had to demonstrate to her that he could get on with his life (Exhibit C; p. 17)

       *g. low recidivism risk*

In the course of his evaluation, Dr. Boggio administered two tests to address Mr. Bartolain's potential risk of recidivism. The first, the Static-99, is an empirically derived actuarial instrument for the assessment of static risk factors related to sexual recidivism. The Second, the PCL:R2 is a clinician-administered rating scale to assist in determining the presence/absence or degree of psychopathy, a combination of personality traits and behaviors associated with significant social deviance and criminality. Based on his low (favorable) scores

on these tests, along with broader risk factors analyzed and contained throughout the report, Dr. Boggio concluded that Mr. Bartolain appears to present with a very low risk of future sexual offending. (Exhibit C; pp. 14, 17).

### *h. treatment progress*

As noted above, Mr. Bartolain has been treating with R. Mark Binderman, since October 20, 2006, in conjunction with taking medications. This combination has had a noticeable positive effect on Mr. Bartolain's mental health issues. Dr. Binderman notes that he has observed "significant improvement of Mr. Bartolain's mood, and in the clarity of his thinking." Further, Dr. Binderman believes that, with continued treatment, "his prognosis is quite good." (Exhibit D; p. 2).

### **2. Mr. Bartolain's Remorse And Acceptance Of Responsibility**

Mr. Bartolain has shown an extraordinary level of remorse and acceptance of responsibility with regard to his involvement in this matter. In fact, his remorse began before the illegal act was completed. As noted by counsel during his plea, and as confirmed in the law enforcement officer's observations, Mr. Bartolain arrived at the agreed location of the planned encounter, and parked across the street from the address of the apartment. However, without ever leaving his car, and after only a couple of minutes, he pulled out of his spot and was driving away from the destination when he was stopped by law enforcement. He realized what he was doing was wrong, and Mr. Bartolain had made the decision not to go through with the plan, and to drive away. Right after he was arrested, Mr. Bartolain was advised of his Miranda warnings and waived his rights. Consistent with his eventual plea of guilty, he admitted to his chatting online with the fictitious female and participating as alleged before the planned meeting. He

admitted to driving into the District to complete the plan, to obtaining items to help facilitate the plan and to parking across the street in contemplation of the plan. However, during that initial uncounseled statement, and at all other times he has discussed the matter subsequently, he has consistently and accurately maintained that he made the decision not to go through with the plan. Mr. Bartolain showed remorse for his actions even before the illegal conduct for which he is guilty was fully completed.

Naturally, his remorse has not subsided. In fact, at least partially due to his deep feelings in this regard, his mental health deteriorated to the point of hospitalization on October 5, 2006. In the same way, Mr. Bartolain has accepted responsibility for what happened. He cooperated with law enforcement after his arrest, agreed to enter a pre-indictment plea, and has never denied the actions indicated in the statement of facts herein.

### 3. Mr. Bartolain's Incarceration And Adjustment To Supervised Release And Electronic Monitoring

After his arrest, Mr. Bartolain was taken into custody and was detained in the D.C. Jail from July 14, 2006 until August 18, 2006. At the plea proceeding herein, Mr. Bartolain was released pending his sentencing hearing, under the condition of pretrial release and supervision, along with home electronic supervision. For approximately four months, Mr. Bartolain has been released under strict observation and supervision, and has shown exemplary behavior. Clearly, Mr. Bartolain responds well to supervision, and the obligations that go along with such constraints. The time period pending sentencing serves as a strong indication that Mr. Bartolain would also respond well to post-trial supervised release.

### 4. Mr. Bartolain's Military Service, And Discharge

As described above, and in more detail in Exhibit C, Mr. Bartolain has served in the

military since 2002.  His commitments have included tours of duty in Afghanistan, and, at times, involvement in patrol field action.  Regardless of where he has been assigned, Mr. Bartolain has served loyally and honorably, and his service has been a source of pride for him.  Nonetheless, based on his conviction herein, Mr. Bartolain will likely receive a discharge under conditions that are less than honorable.  Such a separation from the military will serve to strip from him all the benefits that would normally be associated with the sacrifices he has made.  This thought and knowledge has had a substantial emotional impact on him, and has severely effected his pride and confidence.  Thus, regardless of what punishment Mr. Bartolain receives herein, he is already receiving a severe sanction by the military.

### 5.  Comparison With State Court Sanctions

While any comparison to state court sanctions is generally not required by Federal Court, it is at least instructive to consider the extraordinary effect simply crossing state lines has on someone who has undertaken the kind of activity that Mr. Bartolain undertook.  Similar conduct which occurs completely within a state jurisdiction carries with it a drastically reduced range of punishment.  Obviously, each County jurisdiction varies, but a similar charges in Virginia have netted, in some cases, probation only, or up to several months in jail.  A partner of the Counsel for Mr. Bartolain recently represented two such individuals with similar charges, who received sentences of probation only and three months, respectively.  Thus, Mr. Bartoain's sentencing range is precipitously increased simply because the sting operation which sought to catch him set him up to drive into the District, instead of a location in Virginia.

### 6.  Strong Family Support

Attached hereto, in addition to the exhibits discussed above, are letters written on behalf of Mr. Bartolain. (Exhibit E).  They include documents from His mother, father, grandparents and Ms. Epperly (the young woman who is discussed above).  The letters provide factual support for some of the points made in Dr. Boggio's report and this memo, along with an indication of the support Mr. Bartolain has had, and will continue to have, to help him through this process.  That support is particularly relevant in a positive way when considering his chances of recidivism.

### B. Application of history and circumstances to 3553 factors

Again, 18 U.S.C. §3553 requires district courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in subsection (a)(2).  Those purposes include promoting respect for the law, affording adequate deterrence, protecting the public from further crimes of a defendant and providing a defendant with needed medical care.  Based on the foregoing, it is clear that all four of these purposes have already been complied with.  Mr. Bartolain has exhibited extraordinary remorse, and acceptance of responsibility to indicate a strong respect for the law.  Also, the information provided herein, noting his period of incarceration, his supervised release/electronic monitoring and his pending discharge from the military, along with his felony conviction and requirement to register as a sex offender, shows that Mr. Bartolain has already received substantial punishment.  These factors serve as adequate deterrence to criminal conduct.  Also, it has been noted above (and in Exhibit C) that Mr. Bartolain's background and circumstances would indicate that he is a low risk for recidivism, which provides further support for the assertion that the public will be protected.  Finally, it is documented herein that Mr. Bartolain has substantial mental health issues that need

to be addressed. He has recently begun that process in earnest, and such efforts need to be continued.

### III. Requested Relief

Based on the information provided above, Mr. Bartolain requests the following:

- a sentence below the guidelines range which places him in Zone A of the sentencing guidelines, and a period of probation only; or

- in the alternative, a sentence below the guidelines range which places him in Zone B or Zone C, with a condition that substitutes home incarceration for as much of the sentence as is allowed; or

- if he is required to serve a sentence, that he be sentenced substantially below the guidelines range, and that he be able to self-report to the U.S. Marshalls; also, that he be placed in a facility as close to the Northern Virginia area as possible.

                                          Respectfully submitted,

                                          KYLE BARTOLAIN
                                          By Counsel

By: _____
Mark Petrovich, VSB #36255
PETROVICH & WALSH, P.L.C.
Counsel for Defendant
8001 Braddock Road, Suite 105
Springfield, Virginia 22151
(703) 503-5151

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and accurate copy of the foregoing Objections with Respect to Presentence Report was faxed and/or mailed/hand-delivered this ___ day of December, 2006 to Juliane Himmelstein, Esquire, at the U.S. Attorney's Office, 555 4th Street, N.W., Washington, D.C. 20530, and to Ms. Linsey Epson at the U.S. Probation Office.

_____
Mark Petrovich

Y:\MA&P files\Litigation\Criminal-1\111   FED.Individual.Cases\Bartolain\Senmemo.FED.DC.Bartolain.10.23.06.wpd